# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ATHENE LIFE AND ANNUITY COMPANY, AMERICAN INVESTORS LIFE INSURANCE COMPANY, INC. REVOCABLE TRUST, and INDIANAPOLIS LIFE INSURANCE COMPANY REVOCABLE TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN GENERAL LIFE INSURANCE COMPANY, ZC RESOURCE INVESTMENT TRUST, and ZC RESOURCE LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) C.A. No. 2018-0244-SG ) ) ) ) ) ) ) ) ) |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  May 2, 2019
Date Decided:  July 31, 2019

Martin S. Lessner, Richard J. Thomas, and M. Paige Valeski, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: James P. Gillespie, of KIRKLAND & ELLIS LLP, Washington, D.C.; Adam T. Humann, of KIRKLAND & ELLIS LLP, New York, New York, *Attorneys for Plaintiff Athene Annuity and Life Company*.

Brian C. Ralston, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorney for Plaintiffs American Investors Life Insurance Company Revocable Trust and Indianapolis Life Insurance Company Revocable Trust*.

Kenneth J. Nachbar and Sabrina M. Hendershot, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Defendant American General Life Insurance Company*.

Joel Friedlander and Christopher P. Quinn, of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; OF COUNSEL: John L. Jacobus, J. Walker Johnson, Catherine D. Cockerham, and Michael E. Stoll, of STEPTOE & JOHNSON LLP, Washington, D.C., *Attorneys for Defendants ZC Resource Investment Trust and ZC Resource LLC*.

GLASSCOCK, Vice Chancellor

This matter is before me on the issue of equitable jurisdiction, raised *sua sponte*, and subsequently joined by the Defendants. The heart of the matter is a claim for breach of contracts of insurance between the parties, and declaratory relief as to the obligations of the parties under those contracts. The Plaintiffs also seek specific performance and injunction relief. They allege the possibility of future breach, absent such remedies.

This Court has no statutory jurisdiction here, and the claims are purely legal. The question, then, is whether the requests for equitable relief are substantive, as opposed to a formulaic incantation of an equitable remedy. If, and only if, the former is the case, does this Court have jurisdiction. On the other hand, if a declaratory judgment of contractual rights combined with damages will provide the Plaintiffs with complete relief, I am without jurisdiction, and the matter must be dismissed unless transferred to a court of law.

Upon consideration, I am without jurisdiction here.

## I. BACKGROUND

On February 13, 2019, I held Oral Argument on Defendants ZC Resource Investment Trust's ("ZC Trust") and ZC Resource LLC's ("ZC Resource") Motion to Dismiss, which Defendant American General Life Insurance Company ("American General") joined. At Oral Argument, I raised, *sua sponte*, the issue of this Court's subject matter jurisdiction over this action. The parties, at my request,

filed supplemental memoranda on whether this Court has subject matter jurisdiction, after which I considered the issue of jurisdiction submitted for decision on May 2, 2019. I examine here this Court's equitable jurisdiction and, therefore, assume the factual allegations in the Plaintiffs' Complaint are true,[1] but focus on only those facts relevant to deciding the question of subject matter jurisdiction.[2]

This action is a second incarnation of a case first brought on March 18, 2013 (the "Aviva Litigation"), with the same Defendants and predecessors to the Plaintiffs.[3] In the Aviva Litigation, I granted the Defendants' Cross-Motion for Judgment on the Pleadings on non-substantive grounds (ripeness).[4] No party in the Aviva Litigation raised the question of subject matter jurisdiction at the time, nor did I.

The Aviva Litigation and this action both center on the same contractual relationship between the parties. In October of 2000 and June of 2001, American General separately sold two substantially-similar group-variable life-insurance

---

[1] *Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991) ("Equitable jurisdiction must be determined from the face of the complaint as of the time of filing, with all material factual allegations viewed as true.") (citing *Diebold Comput. Leasing, Inc. v. Com. Credit Corp.*, 267 A.2d 586 (Del. 1970)).

[2] Intrepid readers should consult the Plaintiffs' Complaint for a more detailed summary of their allegations.

[3] *See Aviva Life and Annuity Co. v. Am. General Life Ins. Co.*, 2014 WL 1677798 (Del. Ch. Apr. 29, 2014). Plaintiff Athene Life and Annuity Company was then known as Aviva Life and Annuity Company. Compl. ¶ 16. Plaintiffs American Investors Life Insurance Company, Inc. Revocable Trust and Indianapolis Life Insurance Company Revocable Trust were represented by their trustee, U.S Bank Trust National Association, in the previous litigation. *See Aviva*, 2014 WL 1677798.

[4] *See Aviva*, 2014 WL 1677798.

2

policies (the "Policies) to Plaintiff American Investors Life Insurance Company, Inc. Revocable Trust ("American Investors") and Plaintiff Indianapolis Life Insurance Company Revocable Trust ("IndyLife").[5] American Investors and IndyLife together paid $150 million in premiums for the Policies,[6] and have since merged into Plaintiff Athene Life and Annuity Company ("Athene"),[7] which holds the beneficial interest in the Policies.[8] The Policies are, more specifically, corporate-owned life-insurance ("COLI") policies, whereby the policy owner receives death benefits upon the demise of its covered employees.[9] The premiums paid by the policy owner are invested on its behalf, and the growth on the investments is used to pay the death benefits, which are, importantly, unencumbered by income or capital gains tax, as long as appropriate strictures are followed.[10]

The Policies are governed by certain transaction documents (the "Transaction Documents").[11] Relevant within the Transaction Documents is an agreement by

---

[5] Compl. ¶¶ 24–25. American General, now a subsidiary of American International Group, is a Texas corporation. *Id.* ¶ 19. American Investors is a Delaware trust. *Id.* ¶ 17. IndyLife is a Delaware Trust. *Id.* ¶ 18.

[6] *Id.* ¶¶ 24–25. Athene would later pay an additional $30 million premium in 2001. *Id.* ¶ 8.

[7] *Id.* ¶ 27. Athene is an Iowa corporation. *Id.* ¶ 16.

[8] *Id.* ¶ 27. Athene is the sole grantor and beneficiary of both American Investors and IndyLife. *Id.* ¶¶ 17, 18.

[9] *Id.* ¶ 28.

[10] *Id.*

[11] *Id.* ¶¶ 35–36. According to the Complaint, each of the Policies was governed by six documents, the five documents relevant here are: (1) the Policy Document; (2) a Private Placement Memorandum from American General for the Policy; (3) an additional Private Placement Memorandum from ZC Resource; (4) a Commitment Letter from American General to Athene, and (5) a Commitment Letter from ZC Resource to American General. *Id.* ¶ 35.

3

American General not to "modify, amend or change any of the Transaction Documents in any way which could change in any material respect the rights of [Athene] and/or the terms and conditions of the transactions reflected in the [Transaction] Documents."[12] American General also agreed in the Transaction Documents to indemnify Athene in the event the Policies lost their tax favored status, subject to American General's right to manage the Policies in a manner that ensured compliance with the applicable tax regulations.[13]

American General offered Athene various investment options for the premiums it paid.[14] Athene chose to invest in a portfolio named the SVP (an acronym for "stable-value protection") Balanced Portfolio (the "SVP Balanced Portfolio").[15] The SVP Balanced Portfolio has two components. The first is an equity and bond portfolio (the "Corresponding Portfolio").[16] The second is, as described by the Plaintiffs, a guarantee (the "SVP Product") from non-party Zurich Insurance Company ("Zurich Insurance"),[17] and is calculated as "the difference

---

[12] *Id.* ¶ 36(d).
[13] *Id.* ¶ 38.
[14] *Id.* ¶ 30. There was an annual fee of 0.45 percent of the SVP Balanced Portfolio associated with investment in the SVP Balanced Portfolio. *Id.* ¶ 34.
[15] *Id.* ¶ 6. The SVP Balanced Portfolio is managed by ZC Trust, a Delaware business trust. *Id.* ¶¶ 20, 30. ZC Resource, a Delaware limited liability company, is a trustee of ZC Trust. *Id.* ¶ 21.
[16] *Id.* ¶ 31.
[17] Zurich Insurance Company ("Zurich Insurance") is a Swiss corporation. *Id.* ¶ 22. According to the Complaint, Zurich Insurance "owns and maintains a number of affiliates in the United States, including ZC Trust, ZC Resource, and Benefit Finance Partners, LLC." *Id.* The last of which, a non-party, is the administrator of the Policies. *Id.* ¶ 23.

4

between (i) the total value of the SVP Balanced Portfolio and (ii) the net asset value of the Corresponding Portfolio."[18] The SVP Balanced Portfolio was initially contemplated to grow at a fixed crediting rate, which would be periodically reset based on a formula with the intent to amortize the SVP product over time.[19] In 2001, the parties agreed to amend the Transaction Documents to, among other things, set a minimum crediting rate of eight percent.[20] I note that it is the Defendants' position that the SVP Product has no real value, but is instead an accounting device to smooth returns in the Portfolio over time.[21]

According to the Transaction Documents, Athene could exit its investment in the SVP Balanced Portfolio, either by switching to another investment portfolio offered by American General ("reallocation"),[22] or by exercising its right to "surrender" and receiving the value of its investment.[23]

Over time, as a result of the returns of the Corresponding Portfolio and the application of the eight percent minimum crediting rate, the SVP Product has grown

---

[18] *Id.* ¶ 32.
[19] *Id.* ¶ 33.
[20] *Id.* ¶ 44.
[21] *See, e.g.*, Defs. ZC Resource Inv. Trust and ZC Resource LLC's Br. in Support of Their Mot. to Dismiss, at 17.
[22] Compl. ¶ 39(a). If Athene chose to reallocate its investment, the value of the SVP Balanced Portfolio would be reallocated over four years, through five installments, to another investment portfolio. *Id.*
[23] *Id.* ¶ 39(b). If Athene chose to "surrender" or cancel its Policies, American General was bound by the Transaction Documents to pay Athene the value of the SVP Balanced Portfolio within six months of receiving a demand. *Id.*

5

to become a larger and larger portion of the SVP Balanced Portfolio.[24] In late 2011 and early 2012, the Defendants purported to unilaterally amend the Transaction Documents to "cap" the value of the SVP Product at fifty-five percent of the total value of the SVP Balanced Portfolio (the "SVP Cap") and to change Athene's surrender rights (together, the "2011 Supplements").[25] The Defendants have argued that the SVP Cap is necessary to comply with tax regulations and, therefore, to preserve the tax-favored status of the Policies.[26] The amendment to Athene's surrender rights changed the timing of payment from six months after exercise of the right, to the time at which the value of the SVP Product is at or below zero.[27]

In March 2013, the predecessors to the Plaintiffs brought the Aviva Litigation in response to the 2011 Supplements to the Policies; they sought, among other things, declaratory judgment that the implementation of the SVP Cap and the change to Athene's surrender rights were invalid. On cross-motions for judgment on the pleadings, I dismissed the plaintiffs' claims without prejudice, reasoning that their claims were not yet ripe, because any limit on the SVP cap was only theoretical.[28] Subsequently, the SVP Cap has been implicated, and as a result, the value of a single

---

[24] *Id.* ¶¶ 51, 52.
[25] *Id.* ¶¶ 51, 58. Athene was provided a draft of the changes to the Policies in December 2011. *Id.* ¶ 54. Despite Athene's objections, the Defendants in a January 11, 2012 conference call asserted that they considered the 2011 Supplements to the Policies to be in full force and effect without Athene's approval. *Id.* ¶¶ 58, 59, 60.
[26] *Id.* ¶ 65.
[27] *Id.* ¶ 56.
[28] *Id.* ¶ 67.

death benefit paid under the Policies was reduced by approximately $9,000.[29] The

Plaintiffs, reasoning that its claims are now ripe, brought this action.

Athene's Complaint has three counts. The first count is for breach of contract

and specific performance.[30] Athene argues that American General breached the

Transaction Documents by implementing the 2011 Supplements and breached the

Transaction Documents by paying out a death benefit that would have been greater

by $9,000 absent the SVP Cap.[31] Athene seeks "specific performance" of the

Transaction Documents as they existed before the 2011 Supplements—that is, it

seeks an order that American General cease breaching—and additionally and

alternatively requests monetary damages.[32] The second count is for declaratory

judgment and injunctive relief.[33] Athene seeks a declaratory judgment that the

Defendants are not permitted to implement the SVP Cap (or alternatively that the

initial implementation of the SVP Cap was invalid) and that the Defendants are not

permitted to amend Athene's surrender rights.[34] Athene then requests that I enjoin

the Defendants from acting inconsistently with the declaratory judgment Athene

seeks.[35] The third count is for tortious interference with contract, and is brought

---

[29] *Id.* ¶ 78.
[30] *Id.* ¶¶ 87–97.
[31] *Id.* ¶¶ 88–90.
[32] *Id.* ¶¶ 96–97.
[33] *Id.* ¶¶ 98–106.
[34] *Id.* ¶¶ 104–05.
[35] *Id.* ¶ 106.

7

against only ZC Trust and ZC Resource.[36]  Athene alleges that ZC Trust and ZC Resource implemented the 2011 Supplements and thereby caused American General to breach the Transaction Documents, as amended in 2001.[37]

The Defendants moved to dismiss under Court of Chancery Rule 12(b)(6), failure to state a claim.  At Oral Argument, I questioned this Court's subject matter jurisdiction.  Thereafter, the Defendants filed an Amended Motion to Dismiss to additionally move to dismiss under Court of Chancery Rule 12(b)(1), lack of subject matter jurisdiction.

## II. ANALYSIS

This is a court of limited jurisdiction, and as such may not waive subject matter jurisdiction.[38]  Subject matter jurisdiction is a necessary predicate, without which this Court—a court of limited jurisdiction—has no authority to act.[39]

---

[36] *Id.* ¶¶ 107–12.

[37] *Id.* ¶ 110.

[38] *See* Ct. Ch. R. 12(h) (While a "defense of lack of jurisdiction over the person . . ." may be waived, "whenever it appears by suggestion of the parties or otherwise that the Court lacks jurisdiction of the subject matter, the Court shall dismiss the action.").  The Plaintiffs take issue with the Defendants' amended pleading, which, after I raised the jurisdictional issue *sua sponte*, added an allegation of failure of equity jurisdiction.  The Plaintiffs argue that the Defendants have waived their right to challenge subject matter jurisdiction.  As equity jurisdiction is a predicate to action by this Court, the issue is of no moment, and I do not address it here.

[39] *See Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 77 n.5 (Del. Ch. 1991) ("[I]t is clear that, unlike many jurisdictions, judges in the Delaware Court of Chancery are obligated to decide whether a matter comes within the equitable jurisdiction of this Court regardless of whether the issue has been raised by the parties." (citations omitted)).

*A. Equitable Jurisdiction*

The Court of Chancery is Delaware's court of equity and maintains subject matter jurisdiction in *only* three ways, "if: (1) one or more of the plaintiff's claims for relief is equitable in character, (2) the plaintiff requests relief that is equitable in nature, or (3) subject matter jurisdiction is conferred by statute."[40] The Plaintiffs' Complaint alleges no matters that are equitable in themselves, and no statute provides for jurisdiction here. The Plaintiffs argue that subject matter jurisdiction exists because they seek equitable relief. The Plaintiffs' Complaint, on its face, does indeed reference equitable relief; it requests specific performance (as well as injunctive relief following declaratory judgment).[41] However, "[i]n deciding whether or not equitable jurisdiction exists, the Court must look beyond the remedies nominally being sought, and focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain by bringing his or her claim."[42]

The inquiry into the necessity of equitable relief, in other words, is a "realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate."[43] Where "sufficient remedy may be had by common law, or statute, before any other court or

---

[40] *Candlewood Timber Grp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004) (citations omitted).

[41] Compl. ¶¶ 96, 106.

[42] *Candlewood*, 859 A.2d at 997 (citations omitted).

[43] *Id.* (quoting *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987)).

jurisdiction of this State," the Court of Chancery has no jurisdiction.[44] The equitable jurisdiction analysis is based upon the allegations made in the complaint, taken as true; however, a mere allegation that there is no adequate remedy at law is insufficient to end the inquiry if such allegation is a mere facade.[45]

The Plaintiffs allege that specific performance or injunction are necessary because no adequate remedy at law exists. To be adequate, the remedy at law must "afford the plaintiff full, fair, and complete relief."[46] In the context of a breach of contract claim, there is an obvious remedy at law, damages. As such, a "Court of Equity has no jurisdiction to entertain a suit brought purely for compensatory damages."[47] However, damages may be inadequate to provide complete relief and

---

[44] 10 Del. C. § 342. Section 342 serves to codify "the common law mandate as to equity's concurrent jurisdiction." *Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 497 (Del. 1982).

[45] *Candlewood*, 859 A.2d at 997 (citing *Candlewood Timber Grp. LLC v. Pan Am. Energy LLC*, 2003 WL 22417235, at *2 (Del. Ch. Oct. 22, 2003)); *see also McMahon*, 532 A.2d at 604 ("Chancery jurisdiction is not conferred by the incantation of magic words.").

[46] *El Paso Nat. Gas Co. v. Transamerican Nat. Gas Corp.*, 669 A.2d 36, 39 (Del. 1995).

[47] *Tull v. Turek*, 147 A.2d 658, 664 (Del. 1958); *see also Candlewood*, 859 A.2d 989 at 997 ("Because plaintiffs can adequately seek monetary damages in a court of law for [the defendant's] alleged breach of contract, this Court cannot grant specific performance and, hence, does not have jurisdiction to hear and decide this matter." (quoting *Candlewood Timber Group LLC v. Pan American Energy LLC*, 2003 WL 22417235, at *2 (Del. Ch. Oct. 22, 2003))). The Court of Chancery would of course have jurisdiction if bestowed by statute or if the claims were equitable in character.

10

their award, if possible,[48] may accompany necessary equitable relief.[49]  In such a case, equitable jurisdiction exists to provide the necessary remedy.

Similarly, declaratory judgment exists at law to provide relief to parties in a contractual dispute, but the availability of such relief does not divest this Court of subject matter jurisdiction, where a party would ultimately require equitable relief.[50] On the other hand, invoking equity in a conclusory manner to enforce a declaratory judgment is insufficient to provide jurisdiction; otherwise, any declaratory action would be endowed with spurious equitable features, which would render this Court's limited equity jurisdiction illusory.[51]  Instead, whether subject matter jurisdiction rests with the Court of Chancery in a declaratory judgment action is "determined

---

[48] Damages may be, for example, impossible to measure.  *See, e.g.*, *Cheese Shop Int'l., Inc. v. Steele*, 311 A.2d 870, 871 (Del. 1973) ("Goodwill valuation, however, is subjective and influenced by many factors external to the market place. Therefore, it becomes impossible to measure the dollar value of the franchisor's loss of goodwill in an ongoing successful business arising from the non-performance of trademark provisions by any one franchisee. Only equity can supply an adequate remedy in such case.").

[49] *El Paso Nat. Gas Co.*, 669 A.2d at 39.

[50] *Diebold Comput. Leasing, Inc. v. Commercial Credit Corp.*, 267 A.2d 586, 591 (Del. 1970) ("Jurisdiction under the Declaratory Judgment Act is based on the question of whether law or equity traditionally would have jurisdiction of the subject matter if the controversy should develop to a later stage; of whether the issues raised would be presented in a legal or equitable action if coercive relief were being sought.  Specifically, the Chancery Court has jurisdiction in a declaratory judgment action if there is any underlying basis for equity jurisdiction measured by traditional standards.").

[51] *Charlotte Broad., LLC v. Davis Broad. of Atlanta LLC*, 2013 WL 1405509, at *6 (Del. Ch. Apr. 2, 2013) ("If the Plaintiffs' request for equitable relief in this contract action—to enjoin the Defendant from pursuing rights ostensibly under the Agreement which, in fact, it does not have, and preventing the Defendant from the theoretical pursuit of contractual claims in other courts— were sufficient to convert a purely contractual matter from law to equity, the exception would eat the rule, and this Court would no longer remain a court of limited jurisdiction.").

11

without reference to the declaratory judgment statute," and the Court "applies precisely the same criteria it would if the statute were not there."[52]

It is true, as the Plaintiff argues, that even where a remedy at law is adequate to cure past injury, equitable jurisdiction may, nonetheless, exist when that remedy at law would be inadequate to cure threatened prospective injury.[53] In such a scenario, a plaintiff would be unable to fully recover in a single suit, but would instead be forced to bring a "multiplicity" of suits in response to each future injury.[54] Injunctive relief could then be warranted to forestall wasteful litigation, even where an adequate remedy at law would exist if (or when) the prospective injury came to pass.[55] Equitable jurisdiction, however, is only available on this ground where there exists "a real threat of a multiplicity of lawsuits, and not the mere possibility of such suits."[56]

---

[52] *Jefferson Chem. Co. v. Mobay Chem. Co.*, 253 A.2d 512, 514–15 (Del. Ch. 1969). In *Jefferson Chemical Co. v. Mobay Chemical Co.*, the plaintiff sought more than a declaration of its rights but also "an order which will prevent [the defendant] from interfering with the exercise of whatever rights [the plaintiff] is found to have under the contract." *Id.* at 515. Importantly (and distinguishing from the case at hand), the rights at issue were patent rights. *Id.*

[53] *Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 79–82 (Del. Ch. 1991) (noting that past and future damages would be calculable, but explaining the plaintiff's argument that "absent an injunction, it would [nonetheless] be irreparably harmed because . . . [it] will be forced to bring a multiplicity of lawsuits to enforce its legal rights in the same manner which could be accomplished in this Court by injunction.").

[54] *Id.* at 81–82; *see also Chateau Apts. Co. v. City of Wilm.*, 391 A.2d 205, 206 (Del. 1978) ("A legal remedy may not be adequate, however, although an action for damages could be brought, where the harm suffered will be irreparable or where the injury will occasion a multiplicity of suits.").

[55] *Int'l Bus. Machs. Corp.*, 602 A.2d at 79–82; *see also Tull v. Turek*, 147 A.2d 658, 664 (Del. 1958) (". . . the principle that equity will give full relief to avoid a multiplicity of suits.").

[56] *Int'l Bus. Machs. Corp.*, 602 A.2d at 82 (citations omitted).

12

In a typical contract action, as here, a defendant, motivated by self-interest, claims a contractual right to engage in the behavior of which the plaintiff complains. This is insufficient to threaten post-judgment breaches so as to require equitable relief. That is because a legal decision clarifying the contract and imposing damages changes the incentives of the parties to the contract. In other words, the fact that a breaching party theoretically may re-breach does not support an allegation of a *real* threat of continued injury where a successful suit at law, brought by the plaintiff, would deprive the defendant of both a good faith argument of interpretation *and* its profit-based motive to pursue it.[57]

In light of these principles, I turn to the Plaintiffs' allegations and find that an adequate remedy at law exists.

*B. The Plaintiffs Have an Adequate Remedy at Law*

The Plaintiffs argue that no adequate remedy at law exists to provide relief from the American General's alleged breach of contract resulting from the Defendants' extra-contractual amendment to the Transaction Documents in 2011, and introduction of the SVP Cap.[58] Specific performance is required, per the Plaintiffs, "to prevent American General from taking further actions that will

---

[57] *Id.* For example, in *International Business Machines Corp. v. Comdisco, Inc.*, this Court, faced with claims for breach of contract and related tortious behavior, wrote that the threat of continued lawsuits would be more persuasive "if [the defendant] did not claim a right to possession of the equipment which [the plaintiff] claims has been converted, but was taking the equipment out of spite or for some other non-business purpose." *Id.*

[58] Compl. ¶ 96.

13

irreparably harm Athene by denying it the unique, negotiated benefits of the Policies as well as its investment in the SVP Balanced Portfolio, for which Athene contracted and which are difficult or impossible to quantify."[59]

### 1. Multiplicity of Suit

The Plaintiffs argue in their Complaint that American General breached its contract with the Plaintiffs by implementing the 2011 Supplements and then underpaying (as a result of the 2011 Supplements) a death benefit. The Plaintiffs also seek declaratory judgment that the Defendants did not have the right to implement those same 2011 Supplements. The Plaintiffs concede that "[m]oney damages are sufficient to remedy the reduced death benefit paid to date and declaratory relief will provide a remedy to address the 2011 Supplements."[60] That is, legal relief is a complete remedy for the breaches committed and the damages thus-far incurred. However, the Plaintiffs argue that injunctive relief is necessary, even if they are successful in proving their claims, because "neither money damages nor declaratory relief are sufficient to prevent Defendants' improper implementation of their [SVP Cap] . . . [a]nd neither remedy is sufficient to prevent future amendments that are designed to comply with a potential Court order striking down

---

[59] *Id.* I note that what the Plaintiffs seek is not "specific performance" in the traditional sense of the remedy imposed on a defendant to perform in an executory contract setting. Here, the Plaintiffs simply seek a finding that the Defendants' unilateral contract amendments are unenforceable and an order that the Defendants' comply with the contract going forward, as thus interpreted. This is more properly characterized as a kind of "anti-breach" injunction than specific performance.
[60] Pls.' Reply Mem. in Supp. of Subject-Matter Jur. of the Ct., at 2.

the 2011 Supplements but would similarly eviscerate Athene's contract rights."[61]

Such actions by the Defendants would, per the Plaintiffs, necessitate further litigation. It is, therefore, important to focus on the relief sought.

The Plaintiffs raise three counts in their Complaint, two of which they contend require equitable relief.[62] In "Count 1" of the Complaint, the Plaintiffs bring a claim for breach of contract and seek specific performance and damages. The Plaintiffs argue that American General lacked the contractual authority to amend the Transaction Documents to impose the 2011 Supplements, and that by imposing and implementing these Supplements, American General breached its contract with the Plaintiffs. In addition to a finding that imposing the Supplements is a contractual breach, for which an award of damages is appropriate, the Plaintiffs request specific performance of the contract as it existed, sans Supplements; in other words, they ask equity to direct American General to go, and breach no more.[63]

---

[61] *Id.*, at 2–3; *see also* Pls.' Mem. of Law in Supp. of Subject-Matter Jur. of the Ct., at 6 ("Even if the Court concludes that the 2011 Supplements breach the Parties' agreements, Defendants could attempt to impose new amendments aimed at achieving the same effects in order to avoid their obligations for future payouts.").

[62] The Plaintiffs' third count for tortious interference of contract, brought against ZC Trust and ZC Resource, also purports in the Complaint to seek equitable relief in the form of "injunctive relief from further interference by ZC Trust and ZC Resource." Compl. ¶ 112. However, the Plaintiffs do not argue that this third count supports equitable jurisdiction and have waived any argument that it does. *See* Pls.' Mem. of Law in Supp. of Subject-Matter Jur. of the Ct.; Pls.' Reply Mem. in Supp. of Subject-Matter Jur. of the Ct.

[63] Compl. ¶¶ 96, 97.

The request for equitable relief through specific performance strikes me as entirely unnecessary to remedy the alleged breach. If the Plaintiffs prevail on their contract claim that the creation and implementation of the 2011 Supplements is beyond American General's contractual power, and its employment of the Supplements thus a breach of the Transaction Documents, and if the Plaintiff then recovers damages, what is left for equity to enforce?

In "Count 2" of the Complaint, the Plaintiffs seek declaratory judgments that "the Defendants are not permitted to implement the [SVP Cap] unilaterally under the Transaction Documents and [amendments made in 2001]"[64] and "the Defendants are not permitted to amend the Surrender Protocol unilaterally under the Transaction Documents and [amendments made in 2001]."[65] The Plaintiffs also seek an order prohibiting the Defendants from breaching the Transaction Documents, as they ask me to construe them.[66]

Again, if the Plaintiffs prevail on declaratory relief construing the Transaction Documents as they suggest, equity is superfluous. Generally, this court does not enjoin hypothetical future breaches of contract. It is, I suppose, possible that American General may play the scofflaw and, having lost a declaratory judgment

---

[64] Compl. ¶ 104. Alternatively, the Plaintiffs ask for declaratory judgment that "the Defendants' unilateral implementation of the SVP Cap to impair Athene's and the Trusts' ability to obtain the benefit of the SVP Product is an invalid exercise of their rights under the Transaction Documents and the Restated Transaction Documents." *Id.* ¶ 105.

[65] *Id.* ¶ 104.

[66] *Id.* ¶ 106.

16

action at law determining that it does not have the contractual authority to impose an SVP cap or unilaterally amend Athene's surrender rights, purport in the future to do so nonetheless. The Plaintiffs point out that in such a case, it would then be put to the expense and trouble of further litigation. This is true. No court order (even in equity) is self-enforcing, or proof against bad-faith disregard.[67] However, nothing here indicates that special circumstances compel equity to act.[68] I note that if the mere threat of future breach or disregard of court orders triggered equitable jurisdiction, such jurisdiction would be general, not limited.

The Plaintiffs contend that the risk of further litigation is not hypothetical because the "Defendants have relentlessly sought to eviscerate Athene's guaranteed minimum crediting rate of eight percent and ability to access the SVP Product."[69] The allegation in the Complaint is that the Defendants have sought to reduce their obligation to the Plaintiffs regarding the SVP Product by implementing the 2011 Supplements through unilateral amendment of the Transaction Documents.[70] The Plaintiffs allege that the 2011 Supplements were improper, and that, when the

---

[67] *But see Deuteronomy* 17:11–12 (King James) (". . . [a]ccording to the judgment which they shall tell thee, thou shalt do: thou shalt not decline . . . *to* the right hand, nor *to* the left. And the man that will do presumptuously, and will not harken . . . unto the judge, even that man shall die.").

[68] *Cf. Diebold Comput. Leasing, Inc. v. Commercial Credit Corp.*, 267 A.2d 586, 590–91 (Del. 1970) (finding that a claim for impending—and, for the plaintiff, catastrophic—breach and request for injunctive relief invoked equitable jurisdiction).

[69] Pls.' Reply Mem. in Supp. of Subject-Matter Jur. of the Ct., at 5 (internal quotations omitted).

[70] Compl. ¶¶ 51, 52, 55, 56.

Plaintiffs objected, the Defendants refused to withdraw the Supplements.[71] The Defendants' refusal, per the Plaintiffs, demonstrates the Defendants' intent to breach similarly in the future, necessitating further litigation absent injunctive relief. As support for this statement, the Plaintiffs point to the fact that the Defendants not only amended the Transaction Documents with the 2011 Supplements, but have also, over the years, actually implemented the 2011 Supplements and have consistently refused the Plaintiffs' requests to abandon their contractual position.

The Plaintiffs' argument is tautological. The Defendants have consistently maintained a contract right that is yet to be adjudicated. They have this in common with nearly every litigant in a contract dispute. The Defendants' consistency does not imply a willingness to maintain the same position, post-judgment.[72] I note that the Plaintiffs describe the Defendants' attempts to limit their obligations under the contract as "relentless."[73] However, the singular event complained of is American General's amendments to the contract in 2011, and American General's persistence in maintaining the efficacy of and enforcing those amendments. Nothing in that

---

[71] *Id.* ¶¶ 59–62.

[72] *See Green v. GEICO Gen. Ins. Co.*, 2017 WL 438230, at *2 (Del. Ch. Feb. 1, 2017) (Where the plaintiffs sought an injunction to stop the defendant, an insurer, from continuing to employ a certain rule when adjusting claims, this Court wrote that "[a] declaration that either the insurance policies at issue or the applicable statute(s) do not permit [the defendant] to employ [its rule] in its claim processing would not require an accompanying injunction. There is no indication that [the defendant] would refuse to abide by a final declaratory judgment to this effect." (citation omitted)).

[73] Pls.' Reply Mem. in Supp. of Subject-Matter Jur. of the Ct., at 5.

allegation indicates that American General would disregard a contractual construction in an order of a Delaware court.[74]

The Plaintiffs rely on *Diebold Computer Leasing, Inc. v. Commercial Credit Corp.*[75] In *Diebold*, the plaintiff, a company that leased computers, had a $75 million revolving line of credit with Commercial Credit Corporation ("Commercial").[76] The plaintiff resolved to restructure and diversify its business and advised Commercial of its intent to do so.[77] Commercial responded that pursuant to its loan agreement with the plaintiff, Commercial's approval of the restructuring was required, and would not be forthcoming; further, Commercial provided that if the plaintiff proceeded, Commercial would regard the plaintiff to be in default, and would declare the credit extended (almost $70 million of the $75 million line of credit) to be payable.[78] The plaintiff alleged in its complaint that if Commercial considered the plaintiff to be in default, it would ruin plaintiff's business; nonetheless, the plaintiff still intended to pursue a plan for restructuring.[79] The plaintiff therefore sought an injunction to prevent Commercial from declaring it in default when the plaintiff

---

[74] *See Chateau Apartments Co. v. City of Wilm.*, 391 A.2d 205, 208 (Del. 1978) ("While, to be sure, it is possible that the City could ignore a determination that their rates were unlawful and continue to charge unlawful water rates, we do not find the danger realistic. We decline to assume that, if liability is judicially established against the City, it will charge unlawful rates against the plaintiffs or other customers in deliberate disregard of such determination.").

[75] 267 A.2d 586 (Del. 1970).

[76] *Id.* at 588.

[77] *Id.*

[78] *Id.* at 588–89.

[79] *Id.* at 589.

19

restructured.[80] The Court of Chancery found that a declaratory judgment in Superior Court was available to provide complete relief, divesting it of jurisdiction.[81] Our Supreme Court disagreed, noting the plaintiff's manifest intent to continue with its plan for restructuring, and Commercial's resulting, doom-inducing response.[82] The Supreme Court wrote that "[t]his is the kind of collision course equity serves to avoid in the exercise of its traditional jurisdiction of preventing a threatened breach of contract."[83]

The situation here is different. In *Diebold*, the situation posed imminent harm—no breach had occurred, but the parties' positions and their contrasting views of contractual obligations made (if the defendant was correct in its contractual understanding) breach imminent and, given its fundamental impact on the plaintiff, irreparable. This approaching harm implicated equity. No such "collision course" exists in this action. Here, like *Diebold*, the parties disagree about their contractual obligations. Unlike *Diebold*, here the Plaintiffs allege that breach has already occurred and caused damages, remediable at law; the Plaintiffs' position is that, given the ongoing nature of the contract, the Defendants may breach again. I have

---

[80] *Id.*
[81] *Id.* at 589–90.
[82] *Id.* at 590.
[83] *Id.*

20

already rejected the latter as a ground for equitable jurisdiction. What is left is a contract action, at law.

2. Presence of a Non-Party

The Plaintiffs describe the SVP Product as "supported by a Zurich Insurance Company guarantee"[84] and as "a contractual obligation of Zurich Insurance Company."[85] Zurich Insurance is not a party here, although it appears from the Complaint that Zurich Insurance has certain rights under the Transaction Documents.[86] According to the Complaint, it is Zurich Insurance that would be obligated to pay the value of the SVP Product to Athene in the case that Athene exercised its surrender rights and the Corresponding Portfolio was insufficient to cover the amount owed to Athene.[87] The Plaintiffs argue (for the first time in their Reply Memorandum) that absent specific performance, they would have to seek additional relief against Zurich Insurance. To the extent this issue is before me, I find the Plaintiffs' argument unpersuasive.

The Plaintiffs argue that *East Balt LLC v. East Balt US, LLC* is instructive to this case.[88] In *East Balt*, the seller of certain assets brought an action against the purchasers of the assets for breach of contract, and sought specific performance for

---

[84] Compl. ¶ 7.
[85] *Id.* ¶ 32
[86] *Id.* ¶¶ 33, 40.
[87] *Id.* ¶ 42.
[88] 2015 WL 3473384 (Del. Ch. May 28, 2015).

21

the release of funds held in escrow.[89]  The purchasers argued that this Court lacked subject matter jurisdiction because money damages would be adequate; the seller argued that specific performance and the release of the money held in escrow was necessary because affirmative court action could still be required to effectuate the release of the escrow funds after a grant of damages or declaratory relief.[90]  This Court found that subject matter jurisdiction existed because the equitable relief sought would be more efficient that relief through a law court.[91]  That is because "[w]hile the Superior Court could declare rights, it would be unable to compel the Escrow Agent to deliver the Escrow Amount or order [the defendants] to act."[92]  In other words, only this Court (assuming it vindicated the sellers) could compel, through specific performance, the purchasers to direct their escrow agent to release the funds held in escrow.[93]  The *East Balt* Court noted that escrow agreements are, by nature, fiduciary relationships.[94]

The rationale of *East Balt* is not implicated here simply because the Plaintiffs (may) seek funds held by a non-party; Zurich Insurance is not alleged to hold money in escrow for the Plaintiffs or the Defendants, nor would it necessarily be obligated

---

[89] *Id.* at *1–2.
[90] *Id.* at *3.
[91] *Id.* at *4.
[92] *Id.* at *3.
[93] *Id.* at *2.  The Court noted that "[w]hile the Superior Court could declare rights, it would be unable to compel the Escrow Agent to deliver the Escrow Amount or order Defendants to act." *Id.* at *3.
[94] *Id.* at *3.

to provide the Plaintiffs with money even if the Defendants were compelled by equity to request it.[95]  In other words, nothing in the Complaint alleges that Zurich Insurance is an agent of the Defendants upon whom injunctive relief would be effective here.  Zurich Insurance may be a proper party to this action.  It is unclear to me, however, how equitable relief could compel non-party Zurich Insurance to act, if such is required.  According to the Plaintiffs, it is Zurich Insurance that is ultimately responsible for payment of the SVP Product if Athene exercises its surrender rights (although the Complaint does not disclose whether such payment would be made first to the Defendants and then to Athene, or directly to Athene).  However, whether Zurich Insurance has "guaranteed" the SVP Product is not at issue

---

[95] The Plaintiffs also cite *United BioSource LLC v. Bracket Holding Co.*, which is both instructive and distinguishable.  2017 WL 2256618 (Del. Ch. May 23, 2017).  In *United BioSource LLC*, the plaintiff sold several of its subsidiaries to the defendant, one of the subsidiaries received a large tax refund during the pre-closing period; this refund was placed in the subsidiary's bank account. *Id.* at *2.  The plaintiff brought litigation and sought specific performance of the securities purchase agreement to compel the defendant to forward to the plaintiff the tax refund, which the plaintiff asserted it was owed by contract. *Id.* at *2.  The Court noted that "it is not apparent how a damages award against [the defendant] would have any legal effect [on the subsidiary], which is a separate legal entity." *Id.* at 4.  The plaintiff also alleged that the defendant's parent company was considering sale of the defendant, which could make the defendant less capable of fulfilling any judgment against it in the future. *Id.* at 4.  Therefore, this Court found, "an order of specific performance compelling [the defendant] to direct [its subsidiary] to forward the Tax Refund to [the plaintiff] . . . would be more 'certain, prompt, complete, and efficient' than a damages award." *Id.* at *4.  Here, the Plaintiffs allege in their Complaint that Zurich Insurance "owns and maintains a number of affiliates in the United State [sic], including ZC Trust [and] ZC Resource."  Compl. ¶ 22.  The Complaint does not suggest that those two defendants could direct their parent company or affiliate to act.  Furthermore, no allegation is made as to the relationship between Zurich Insurance and American General.  Therefore, nothing in the Complaint or the Plaintiffs' briefing suggests that Zurich Insurance is an escrow agent or otherwise holds money accessible by the Defendants.  Additionally, unlike in *East Balt* and *United BioSource LLC*, the Plaintiffs here do not seek to convert the SVP Product into a monetary amount payable by any party or non-party, which is to say that the Zurich Insurance guarantee, if it is such, is not implicated in this action.

in this action; Athene has only put at issue whether the 2011 Supplements were proper (which affects only the value of the SVP Product, not who is responsible for their payment in case of surrender). The potential need for Athene to pursue additional legal action against Zurich Insurance does not here support specific performance, when that specific performance would not negate the need for additional legal action.

## C. Designation Is Not Appropriate

I have found that this Court lacks subject matter jurisdiction. The Plaintiffs argue that, in that event, I may (and should) request to be designated a judge of the Superior Court of Delaware to hear this matter, pursuant to Article IV, Section 13(2) of the Delaware Constitution.[96] I decline to make such a request and do not find it is in the interest of judicial efficiency. The Plaintiffs posit that I have "invested significant time and resources into understanding the highly complex factual and legal issues involved in this case."[97] While I have now had before me a substantially similar case twice, the first incarnation was dismissed on a Motion for Judgment on the Pleadings as unripe, and this case too will be dismissed from this Court before discovery has begun. Interestingly, the Plaintiffs also aver that I "possess[] six years

---

[96] Del. Const. of 1897 art. IV, § 13(2) ("Upon written request made by the Chancellor . . . to designate one or more of the State Judges . . . to sit in . . . the Superior Court . . . and to hear and decide such causes in such Court and for such period of time as shall be designated.").

[97] Pls.' Mem. of Law in Supp. of Subject-Matter Jur. of the Ct., at 12.

of background."[98]   While the Aviva litigation was filed over six years ago, on March 18, 2013, it was dismissed on May 1, 2014 on preliminary grounds.  The Complaint here was not filed until April 3, 2018.  The intervening years have, I confess, made me less familiar with this matter, not more so.

Constitutional designation may be a useful tool where parts of a litigation will inevitably, otherwise, proceed in both law and equity.  There, it may be efficient to assign a single judge by designation. [99]   Here, in light of the current Complaint, a single judge at law will be able to resolve this matter in its entirety.   Judicial

---

[98] Pls.' Reply Mem. in Supp. of Subject-Matter Jur. of the Ct., at 8.

[99] The Plaintiffs cite *Brandywine Flowers, Inc. v. W. Am. Ins. Co.* for the proposition that I should seek designation as a Superior Court judge.  1993 WL 133176 (Del. Ch. Apr. 19, 1993), *aff'd*, 633 A.2d 368 (Del. 1993).  Vice Chancellor Berger sat by designation as a Superior Court judge in *Brandywine*, but the opinion makes no mention and conducts no analysis of why designation was appropriate in that case.  The Plaintiffs also cite *Monsanto Co. v. Aetna Cas. & Sur. Co.*, where a Superior Court judge sat by designation as a Vice Chancellor "in order to adjudicate the equitable issues in [that] case." *Monsanto Co. v. Aetna Cas. & Sur. Co.* (*Monsanto II*), 1993 WL 563252, at \*5 (Del. Super. Dec. 9, 1993).  In an early opinion in the same case, the preceding Superior Court judge explained that a parallel action had been stayed in the Court of Chancery (which he noted may not have jurisdiction if the defendant has an adequate remedy at law), that the defendants sought "equitable" counterclaims in the Superior Court action, and that it was "clearly in the best interests of judicial economy to avoid severing a portion of [the] case;" therefore he had been designated to sit in the Court of Chancery. *Monsanto Co. v. Aetna Cas. & Sur. Co.* (*Monsanto I*), 1989 WL 997183, at \*1–2 (Del. Super. Sept. 29, 1989) (denying the motion to dismiss in favor of the Court of Chancery action or alternatively to transfer the action to the Court of Chancery). The Plaintiffs quote from a later opinion in the same case, where the Court explained "[t]his step was taken to conserve resources and enhance judicial efficiency due to the complexity of this case . . . ." *Monsanto II*, 1993 WL 563252, at \*5.  The Plaintiffs omit the remainder of the sentence and paragraph, which state: "but it was not intended to blend the two distinct jurisdictions of the Superior and Chancery Courts.  Because [one of the defendant's] motion seeks an equitable remedy, its application must be made in the Court of Chancery." *Monsanto II*, 1993 WL 563252, at \*5.  The Superior Court then denied the defendant's motion for partial summary judgment, in part, because "this [c]ourt lacks the jurisdiction to adjudicate equitable issues, it may not provide equitable relief in the form of reformation of the contract . . . ." *Monsanto II*, 1993 WL 563252, at \*6 (Denying the motion for the additional reason that "[t]he Missouri parol evidence rule prohibits the inclusion of the proposed pollution exclusion in the insurance policy at issue . . . .").

efficiency would not be furthered by my designation. I have found that this Court does not possess equitable jurisdiction, nor does this Court's jurisdiction attach under some other theory. A policy of designation in light of the glancing involvement of the Court of Chancery in a related matter would do little to advance efficiency, but much to undermine this Court's limited jurisdiction.

*D. Motion to Amend*

The Plaintiffs request leave to amend their Complaint if I find that this Court lacks equitable jurisdiction because, per the Plaintiffs,[100] "this case presents issues *fundamentally* equitable in nature."[101] They suggest there may be cryptic trust issues present that would convey equitable jurisdiction here,[102] if fleshed out in an amended complaint. I note that if the matter includes issues that are indeed fundamentally equitable in nature, they should have appeared in the Complaint explicitly or have been so apparent implicitly as to confer equitable jurisdiction. The Plaintiffs have not moved to amend; consequently, I do not have the advantage of a proposed amended complaint. Regardless, I find it unlikely that an amendment would vest me with jurisdiction. However, having proceeded to examine ripeness despite the lack of equitable jurisdiction in the Aviva Litigation—that is, having failed to appropriately address jurisdiction in the previously-filed action—I bear

---

[100] Pls.' Mem. of Law in Supp. of Subject-Matter Jur. of the Ct., at 13 n.3.

[101] Pls.' Reply Mem. in Supp. of Subject-Matter Jur. of the Ct., at 8 n.4 (emphasis added).

[102] *See id.* (citing and quoting a section of an United States Supreme Court opinion, *CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011), regarding the relationships between trusts and equity).

responsibility for the inefficiency of the Plaintiffs' attempt to litigate in this forum a second time.[103] If there are indeed non-pretextual equitable pleadings here that are ripe, which (if this case were transferred to the Superior Court and those pleading there pursued) could cause more jurisdictional questions and inefficiency down the line, I would like to avoid such a problematic outcome. I will withhold an order in this matter until the parties confer on a possible amendment and whether it would raise legitimate jurisdictional considerations, and whether it should otherwise be permitted. The parties should inform me promptly on how they intend to proceed in this regard.

## III. CONCLUSION

The Court of Chancery lacks subject matter jurisdiction over the Complaint. While on its face the Complaint seeks equitable relief, an adequate remedy at law exists. This action must be dismissed unless the Plaintiffs elect transfer to the Delaware Superior Court. I shall defer an order pending resolution of the request to amend the Complaint.

---

[103] *Cf. Diebold Comput. Leasing, Inc. v. Commercial Credit Corp.*, 267 A.2d 586, 590 (Del. 1970) (opining that the Court of Chancery should have allowed leave to file an amendment and considering the substance of the denied amendment in making their determination).